02-09-337-CR









 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT
 OF APPEALS
 SECOND
 DISTRICT OF TEXAS
 FORT
 WORTH
  
 
 


 

NO. 02-09-00337-CR

 

 


 
 
 KELLY MUNN
 
 
  
 
 
 APPELLANT
 
 


 

V.

 


 
 
 THE
 STATE OF TEXAS
 
 
  
 
 
 STATE
 
 


 

 

------------

 

FROM THE 396TH DISTRICT COURT OF TARRANT COUNTY

 

------------

 

MEMORANDUM OPINION[1]

 

------------

I.  Introduction

          In three points, Appellant
Kelly Munn appeals his conviction for murder.  We affirm.

II.  Factual and Procedural
Background

Munn was charged with the murder of
Scott Sartain.  A jury found Munn guilty of murder and assessed punishment at ninety-nine
years’ incarceration.[2] 
 Because Munn challenges the sufficiency of the evidence to support his
conviction, we will address the evidence in greater detail below.

III.  Sufficiency of the Evidence

          In his first and second points,
Munn challenges the legal and factual sufficiency of the evidence to support
his conviction for murder, but after Munn filed his brief, the court of criminal appeals held that
there is no meaningful distinction between the legal-sufficiency and the factual-sufficiency
standards.  Brooks v. State, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (overruling Clewis
v. State, 922 S.W.2d 126, 131–32 (Tex. Crim. App. 1996)).  Thus, the Jackson
standard, explained below, is the “only standard that a reviewing court should
apply in determining whether the evidence is sufficient to support each element
of a criminal offense that the State is required to prove beyond a reasonable
doubt.”  We overrule Munn’s second point.

A.  Standard of Review

In our due-process review of the
sufficiency of the evidence to support a conviction, we view all of the
evidence in the light most favorable to the prosecution to determine whether
any rational trier of fact could have found the essential elements of the crime
beyond a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307, 319, 99
S. Ct. 2781, 2789 (1979); Clayton v. State, 235 S.W.3d 772, 778 (Tex.
Crim. App. 2007).  This standard gives full play to the responsibility of the
trier of fact to resolve conflicts in the testimony, to weigh the evidence, and
to draw reasonable inferences from basic facts to ultimate facts.  Jackson,
443 U.S. at 319, 99 S. Ct. at 2789; Clayton, 235 S.W.3d at 778.  The
trier of fact is the sole judge of the weight and credibility of the evidence. 
See Tex. Code Crim. Proc. Ann. art. 38.04 (West 1979); Brown v. State,
270 S.W.3d 564, 568 (Tex. Crim. App. 2008), cert. denied, 129 S. Ct.
2075 (2009).  Thus, when performing an evidentiary sufficiency review, we may
not re-evaluate the weight and credibility of the evidence and substitute our
judgment for that of the factfinder.  Williams v. State, 235 S.W.3d 742,
750 (Tex. Crim. App. 2007).  Instead, we Adetermine whether the necessary
inferences are reasonable based upon the combined and cumulative force of all
the evidence when viewed in the light most favorable to the verdict.@  Hooper v. State, 214 S.W.3d
9, 16–17 (Tex. Crim. App. 2007).  We must presume that the factfinder resolved
any conflicting inferences in favor of the prosecution and defer to that resolution. 
Jackson, 443 U.S. at 326, 99 S. Ct. at 2793; Clayton, 235 S.W.3d
at 778.  The standard of review is the same for direct and circumstantial
evidence cases; circumstantial evidence is as probative as direct evidence in
establishing the guilt of an actor.  Clayton, 235 S.W.3d at 778; Hooper,
214 S.W.3d at 13.

B.  Applicable Law

          A person commits the offense of
murder if he intentionally or knowingly causes the death of an individual.  See
Tex. Penal Code Ann. § 19.02(b)(1) (West 2011).

          In a homicide case, the
State is not required to produce a body.  See Fisher v. State, 851
S.W.2d 298, 303 (Tex. Crim. App. 1993) (“[P]roduction and identification of the
victim’s body or remains is not part of the corpus delicti of murder.”), cert.
denied, 531 U.S. 1164 (2001).  The State must show the death of the victim was
caused by the criminal act of the defendant.  McDuff v. State, 939 S.W.2d
607, 614 (Tex. Crim. App.), cert. denied, 522 U.S. 844 (1997).

The jury charge included, and the
indictment alleged, several manners and means by which Munn, acting alone or as
a party, intentionally or knowingly caused Sartain’s death:  by a manner and
means unknown to the grand jury, or “by kicking [Sartain] with his feet or by
punching him with his hands or by preventing [him] from obtaining insulin in
sufficient quantities to prevent his death when [Munn] knew that . . . Sartain
was an insulin-dependent diabetic, or by a combination of any or all of the
aforementioned means.”

C. Evidence

          1.
The Beating 

On September 6, 2007, Sartain, a methamphetamine user and an
insulin-dependent diabetic, stole his grandmother’s checkbook, forged a check,
and gave it to his friend Natalie Bazan to cash.  Police arrested Bazan after the
bank confirmed that the check was forged.  Bazan’s husband, Brian Johns, upset by
Bazan’s arrest, bailed her out, and then the two confronted Sartain in a back
room at Munn and Alejandro Orona’s house.

Johns and Bazan both hit Sartain, and when Sartain moved to the front of
the house to leave, Munn and Orona joined in and beat Sartain with their hands
and feet.  Sartain covered his head and was knocked to the ground.  Several people
at the house yelled for Munn and Orona to stop, but they continued kicking and
hitting Sartain.  Bazan, Johns, and the other people in the house fled as the
beating continued.

2.  Brian Johns’s Testimony 

Johns
testified about Bazan’s arrest and his role in starting the fight with Sartain.
 He said that Munn and Orona joined in as the fight moved to the front of the
house, and that Munn said, “Go to sleep, bitch,” as he repeatedly hit Sartain
in the head.  He testified that Sartain did not fight back; that Johns told
Munn and Orona to stop; and that he, his wife, and others left the house when
Munn and Orona would not stop beating Sartain.  Johns also said that several days
after the fight, Munn called him and asked him to go to the store for him or to
take Munn to the store and that when he arrived at the house, the house smelled
like “something was rotting real bad.”  He saw Munn and Orona emerge from a
back room containing a table on which saws and knives rested, and he saw Munn hold
up Sartain’s severed head.  Johns ran out of the house to tell friends what he
had seen.

3.  Melissa Morante’s Testimony

Melissa Morante testified that she
saw Munn, Orona, and Johns beating Sartain.  She stated that Munn was doing
most of the beating—kicking and punching Sartain—and that she and others left
the house when Munn and Orona refused to comply with their pleas to stop
beating Sartain.  She testified that when she returned to the house the day
after the fight, she heard moans coming from the garage.  When she asked about
the moaning, Munn told her to, “Just shut up, you’re tripping,” and “Shut up,
don’t say anything.”

Morante also testified that between
the time of her initial interview with Arlington Police Detective Jim Ford about
the murder and her testimony before the grand jury, she had been arrested on
unrelated drug charges.  She stated that she did not tell Detective Ford or the
prosecutor assigned to Munn’s case about her arrest because she had reached a
confidential deal to work as an informant for the Fort Worth Police Department
(FWPD) in exchange for the drug charges being dropped.  Morante confirmed that
the State had made no promises to her at the time of her initial interview with
Detective Ford, her testimony before the grand jury, or her testimony at
Orona’s trial.  (Orona, also arrested for Sartain’s murder, was tried
separately before Munn.)[3]
 She admitted that just prior to Orona’s trial, she had failed to meet the
terms of her deal with the FWPD, and she was re-arrested on the drug charges.  She
also confirmed that in exchange for her truthful testimony at Munn’s trial, the
State had offered her a reduced sentence on those charges.

4.  Rebecca Brauer’s Testimony

Rebecca Brauer, who was not present at the beating, testified that she
went to Munn and Orona’s house a few days after the fight and that she heard
Munn tell Orona to feed and water the “dog” as he pointed toward the garage.  She
said that after her visit, Munn and Orona—who normally had frequent
visitors—“kind of closed the house down for a week or so.”  Brauer stated that
when she returned to the house a week later, Munn and Orona were mopping the
floor with Fabuloso cleaner, and that the house “smelled like a dead animal.”  She
testified that after Munn and Orona had moved out of the house, Munn, while
intoxicated, appeared scared as he expressed concern that crime scene
technicians had examined the house.  Munn stated that he had used bleach to
clean up blood, and told her about blood in trash bags.

On cross-examination Brauer stated that Munn told Orona to feed and water
the dog in Spanish—a language she understands “a little bit,” but that she does
not speak.  Brauer, who testified in jail clothes because she was arrested the
day of Munn’s trial for failure to post bond on an unrelated
misdemeanor-marijuana charge, stated that she was not testifying voluntarily
and acknowledged that she had past drug convictions.

5.  Sanjuana Garcia’s Testimony

About a week after the beating, Sanjuana Garcia—who had fled from the
house with Morante—returned to the house and noticed a strong dead animal
smell.  Garcia testified that between the time of her initial interview with Detective
Ford and her testimony before the grand jury, she and Morante had been arrested
on unrelated drug charges.  Like Morante, Garcia did not tell Detective Ford or
the prosecutor assigned to Munn’s case about her arrest because she had also reached
a confidential deal to work as an informant for the FWPD in exchange for the
drug charges being dropped.  She admitted that just prior to testifying at
Orona’s trial, she had failed to meet the terms of her deal with the FWPD, that
she was re-arrested on the drug charges, and that in exchange for her truthful
testimony at Munn’s trial, the State offered her a reduced sentence on the drug
charges.  On cross-examination Garcia admitted to smoking methamphetamines the
day of the beating and confirmed that Munn was a “clean freak.”

6.  Dennis Osborne’s Testimony

Dennis Osborne, Munn’s best friend, who was not present at the fight,
visited the house several days after the fight.  He testified that Munn told him
that he and Orona had beaten Sartain because he owed them money.  Osborne said
that Munn had asked him to check on Sartain in the garage and to feed Sartain a
burger and get him something to drink but that Osborne refused because he
“didn’t want to be a part to [sic] any of this. I didn’t want to believe any of
it was true.”

Osborne stated that on his next visit
to the house, there were dryer sheets on all of the air conditioning vents,
that Munn had Vicks Vapor Rub on his nose, and that Munn told Osborne that
Sartain had died after Munn and Orona had beaten him a second time, after Sartain
had “got[ten] better and started screaming and yelling.”  Osborne confirmed
that Munn knew that Sartain was diabetic while the beatings were occurring.

Osborne testified that later, during
a barbecue cook-out at the house, Munn told Osborn that “he had just gotten rid
of the problem . . . that [Munn and Orona] only had an arm and a leg left . . .
.”  Osborne confirmed that Clayton Miller and Shannon Marlowe were at the
barbecue and that he later helped Miller and Marlowe load a beat-up black Grand
Prix that was missing its hood onto a tow-dolly hooked up to a Chevrolet
pick-up truck.  The pick-up truck had a bathtub full of trash bags in its bed.  Osborne
testified that the bathtub had previously been in Munn’s garage and that there
was a maroon stain in the garage where the bathtub had been located.  He said
that Miller later told him that the Grand Prix was in Waco.  Osborne also testified
that sometime after the car was disposed of, Munn described and demonstrated to
Osborne how he had cut up Sartain’s body.

Osborne, in jail clothes, confirmed that he was in federal custody at the
time he gave his initial statement to Detective Ford, that Detective Ford wrote
his statement for him because he was dyslexic, that after Detective Ford read
his statement to him, that Osborne dictated corrections to his statement, and
that Osborne initialed those corrections.  Osborne said that he declined
Detective Ford’s offer to speak to federal authorities or the parole board on
Osborne’s behalf; that his release from federal custody was not related to his
statement; and that three days prior to Munn’s trial, the State arrested him
for evading arrest.  He stated that he was not testifying voluntarily and that
in exchange for his testimony at Munn’s trial, the State agreed to drop the evading-arrest
charges.

On cross-examination, Osborne admitted that he had a history of selling
drugs and that he told Munn’s investigator (1) that he did not see any body
parts, (2) that he felt pressured into his statement and his previous
testimony, (3) that Detective Ford had threatened his freedom and told him what
to say, (4) that he was worried because his urine had tested positive for drugs,
(5) that his statement was “bullshit,” and (6) that in “his heart” he knew that
Munn was innocent.  Osborne also stated that he had lied to Munn’s investigator
because he was scared of Munn, the State, and the defense, and that was why his
statement to the police and testimony differed from what he told Munn’s
investigator.  He further testified that Detective Ford told him that he had it
out for Munn; that because he was already “doing time,” he was not concerned
about the results of his urine test;  that Munn’s electricity was off around
the time of the beating; that because Munn lacked power, a big pot of chicken
and dumplings spoiled on the stove; that Munn and Orona kept the house pretty
clean; and that they threw all of their trash, including the spoiled chicken
and dumplings, into the garage.

7.  Joe Olivarez’s Testimony

          Joe Olivarez, who was not
present at the beating, testified that he was a methamphetamine user and
occasionally bought drugs from Munn and Orona, that he met Sartain several
months before the beating at a house where they both purchased drugs, that Sartain
lived with him for a while, and that he has not heard from Sartain since the
day of the beating.  He also stated that Sartain drove a black “Grand Prix or
Monte Carlo.”

Olivarez,
in jail clothes, confirmed that he had been arrested for attempted forgery and
that because he was a repeat offender, he was facing a twenty-five-year-to-life
sentence on that charge.  He also testified about his criminal history—that he
had served a fifteen-year sentence for murder, that he had served six years for
amassing three DWI charges in an eight-month period, and that he had also
served nine months for possession of a controlled substance.  He stated that a recent
charge against him for being a felon in possession of a weapon had been dismissed
because of insufficient evidence.  He confirmed that once he finished
testifying in Munn’s case (in exchange for his guilty plea), the State would
waive the repetition counts on his forgery charge, which would reduce the punishment
range to that of a state-jail felony charge (six months to two years).  He also
confirmed that because he would get credit for time served, he would be
released at the end of his duties as witness in Munn’s trial.

8.  Chris Barakat’s Testimony

          Chris Barakat, a
self-employed auto-shop and U-Haul dealership owner in Arlington, testified
that he rented a tow-dolly to Marlowe on October 22, 2007, and confirmed that
the receipt stated that a Chevrolet half-ton pick-up truck would be used to tow
a 2000 Pontiac Grand Prix.  He said that he thought that the tow-dolly had not
been returned “but [did not] know that information.”

          9.  Joshua Schlasman’s
Testimony

          Fifteen-year-old Joshua
Schlasman testified that sometime in 2007, Clayton Miller and a woman driving a
Chevrolet Z71 pick-up truck towed a beat-up black Pontiac Grand Prix to Waco
and left it with Dayarl Matheny,[4]
who Schlasman’s family was living with at the time.  Schlasman said that
although the Pontiac car contained loose trash and was missing its hood, a
bumper, the windshield, and some windows, it was still drivable.  He also said
that there was a bathtub filled with trash and tires in the bed of the
pick-up.  He testified that later that evening, he and his mother looked inside
the trunk of the car, that he saw a clear bag with either “blood or transmission
fluid on it,” and that his mother quickly slammed the trunk shut.  He said that
they sold the bathtub and burned the trash bags and loose trash, and that
Matheny cut apart the Grand Prix, burned out the interior, and sold the car as
scrap metal.  Although he told police in his initial statement that he did not
see any blood or body parts, Schlasman testified that he thought he saw an arm
in the trunk but that he could not be sure.

On cross-examination, Schlasman confirmed that he had not mentioned
seeing any body parts in his prior testimony at Orona’s trial.  Later, after a
bench conference, Schlasman was recalled for further cross-examination, and he
stated that he had exaggerated in his testimony and admitted that he had not
seen any body parts in the car.

10.  Arlington Police Detective Jim Ford’s Testimony 

A few months after the beating, Detective Ford received a tip about a
murder from an Arlington jail inmate.  Detective Ford eventually tracked down
witnesses and, approximately seven months after the beating, although Munn and
Orona no longer lived there, the police searched the house and yard for
evidence of a murder.  Detective Ford testified that a chemical sprayed onto
the walls and floors showed some areas that could have blood on them but that
police were unable to perform further testing before the chemicals destroyed
the potential DNA samples.  He also confirmed that the blood samples that the
police took from baseboards in the living room did not test positive for
Sartain’s DNA.  Detective
Ford stated that he located a badly damaged tow dolly in Waco that had been
rented by Marlowe, that Sartain had been arrested shortly before his
disappearance,[5]
and that he had obtained information about the vehicle Sartain drove from
impound records related to that arrest and from witnesses.  He confirmed that
Sartain had been listed as “missing endangered” in a database that is accessible
to all law enforcement agencies and that he had not received any contacts
related to Sartain’s presence on the list.

On cross-examination, Detective Ford acknowledged that he was not
testifying that the vehicle Sartain drove was registered to Sartain, and he
confirmed that Munn had shown proof of insurance and paid the fee to retrieve
the car from the impound.  He also confirmed that in an unrelated November 2007
investigation of Munn’s house,[6]
the police analyzed eighteen swab-based samples of material from baseboards,
walls, and a ceiling that they acquired for testing and found no evidence of
Sartain’s DNA.  Detective Ford also stated that the room searched in November
2007 was not the room where the fight with Sartain had started.  He agreed that
the house contained no physical evidence that related to Sartain.

11.  Jo Ann Mitchell’s Testimony

Mitchell, Sartain’s mother, testified that, after the forgery incident,
she told Sartain that she never wanted to see him again.  But she also
explained that he was very close to his grandmother and visited her often and
that neither she nor her mother had heard from Sartain after the day of the
beating.  She confirmed that Sartain had a car but said that she did not know
what kind.  She testified that Sartain was a “brittle diabetic” and that he had
a history of complications and hospitalizations due to his heightened sensitivity
to insulin.

12.     Deputy Tarrant
County Medical Examiner Lloyd White’s Testimony

 

Dr. White testified that he had reviewed Sartain’s medical records from 2005
to 2007, that too much or too little insulin causes brittle diabetics to become
ill very quickly.  He also said that, based on Sartain’s medical records, a
person with a similar medical condition who was subjected to a serious
injury—such as the beating Sartain experienced—would be more vulnerable to
death than a person without the same medical condition.  Specifically, Dr White
stated that “any kind of injury . . . exacerbates the effects of diabetes” and that
the most serious effect would be ketoacidosis which could result in sudden
death.

          13.  Defense Witnesses Testimonies

          Charlotte Youngquist,
Munn’s mother, and Amy Garcia, Munn’s sister, testified that while they were
both visiting Munn in jail before trial, they heard Johns, who was working in
the jail’s visiting area, speak to Munn on the jail’s phone-intercom system.  They
both said that although they could only vaguely hear Munn’s side of the
conversation, they heard Munn ask Johns why he lied, and that Johns responded
that the police made him do it.

Melissa Gutierrez, the mother of
Munn’s children, testified that she and Munn broke up in 2003, that they shared
parenting of their two children, that their parenting activities occasionally
evolved into romantic encounters, and that she and her children were at Munn’s
house the weekend of the beating.  She said that she arrived at Munn’s house at
7:30 p.m. on Friday, September 7, 2007, that a tattoo artist present at Munn’s
house gave her a tattoo, and that she remembered the date because she acquired
the tattoo the weekend before her mother’s birthday on September 13.  She also
said that Munn, Orona, and the tattoo artist were the only people at Munn’s house
on Friday; that she spent Friday night at the house; that the next morning, she
retrieved her children from another residence and returned with them to Munn’s
house where they all spent Saturday night; and that she and her children left the
house on Sunday.  Gutierrez said she returned to Munn’s house on Thursday,
September, 13, 2007, and spent the night.  She testified that during this time,
she had not observed anything out of the ordinary, had not smelled anything
unusual, and was not restricted from entering any part of the house.

On cross-examination, Gutierrez
admitted that although she had visited Munn at least thirty times in jail, she did
not alert Munn’s attorney to the facts in her testimony until the week of the
trial.

D.  Analysis

          Munn argues that the evidence is
insufficient to prove that Sartain is deceased or that Sartain was murdered. 
Specifically, he argues that although the evidence shows that Sartain is
missing, the evidence is insufficient to show that Sartain owned the Grand
Prix, that there is no evidence linking Munn to Sartain’s death, and that each
of the state’s key witnesses suffered from “significant credibility issues.”

1.   Witness Credibility

          As noted above, the trier of fact is
the sole judge of the weight
and credibility of the evidence. See Tex. Code Crim. Proc. Ann. art
38.04; Brown, 270 S.W.3d at 568.  The jury may choose to believe or
disbelieve all or any part of any witnesses’ testimony.  Sharp v. State,
707 S.W.2d 611, 614 (Tex. Crim. App. 1986), cert. denied, 488 U.S. 872
(1988).  Likewise, reconciliation of conflicts in the evidence is within the
exclusive province of the jury.  Jones v. State, 944 S.W.2d 642, 647
(Tex. Crim. App. 1996), cert. denied, 522 U.S. 832 (1997).

Morante, Garcia, and Osborne all
appeared before the jury in jail clothes.  They all testified about the reasons
behind their arrests, any deals made with the State related to their testimonies,
and whether they were testifying willingly or not.  In addition, although Johns
admitted that he started and participated in the fight with Sartain, his
testimony that he left when Munn and Orona refused to stop beating Sartain was
corroborated by Morante’s and Garcia’s testimonies.  Osborne testified that
Munn admitted that Sartain had died after a second beating and that Munn said
that he had dismembered Sartain’s body.  Moreover, the jury heard Osborne and Olivarez
testify that Sartain drove a black Grand Prix, and the jury heard Schlasman’s
testimony that Miller and a woman had disposed of such a vehicle.

The jury was fully aware of the deals
between the witnesses and the State regarding the witnesses’ pending offenses
and the circumstances surrounding their decisions to testify, and Munn questioned
the witnesses about these issues.  See id.; see also Douglas v. State,
No. 05-06-00198-CR, 2006 WL 3742902, at *3 (Tex. App.—Dallas Dec. 21, 2006)
(mem. op., not designated for publication) (noting that a jury was free to
decide if a witness testified truthfully or was influenced by his agreement
with the State), cert. denied, 552 U.S. 1246 (2008).  And, even though the
jury heard Schlasman admit that he exaggerated about seeing body parts, the
jury was free to believe his testimony that Miller delivered a black Grand Prix
to the chop-shop in Waco.  See Sharp, 707
S.W.2d at 614.  Likewise,
the jury was free to disbelieve any or all of Gutierrez’s testimony about her presence at the house
at the time of the events in question.  Id.  And, the jury was free to determine
that the Grand Prix was Sartain’s car.  Id.

          2.  Sufficiency

Munn also argues that his conviction
is not supported by an extrajudicial confession or a body and, thus, the
evidence is legally insufficient to establish the corpus delicti of
murder.  But the record reflects that Munn told Osborne—a party not present at
either beating—that Munn and Orona beat Sartain a second time and that Sartain
died as a result.  Thus, Munn admitted that Sartain died as a result of Munn’s
intentional actions, and we are left to determine whether the independent
evidence corroborating Munn’s extrajudicial confession renders the commission
of Sartain’s murder more probable than it would be without the evidence.  See
Williams v. State, 958 S.W.2d 186, 190 (Tex. Crim. App. 1997); Fisher,
851 S.W.2d at 302–03; see also Gonzales v. State, 190 S.W.3d 125, 130
(Tex. App.—Houston [1st. Dist.] 2005, pet. ref’d) (noting that a defendant’s
extrajudicial confession corroborated by independent evidence tending to
establish corpus delicti is sufficient to uphold a conviction), cert.
denied, Gonzales v. Texas, 549 U.S. 1000 (2006).

Munn argues that “a review of all th[e]
testimony fails, even in the light most favorable to the verdict that the
jurors could infer that [Munn] murdered Mr. Sartain, dismembered the body, put
it in a car and had it burned . . . because no physical evidence corroborated
this alleged carnage.”  Munn misstates the State’s burden.  The State was not
required to show how Munn disposed of Sartain’s body or personal property, but
testimony about Munn’s actions relative to those events could serve as evidence
to prove that Munn murdered Sartain; the State was required to show beyond a
reasonable doubt that Munn murdered Sartain as alleged in the indictment.  See
Swearingen v. State, 101 S.W.3d 89, 96 (Tex. Crim. App. 2003).

Here, the evidence reflects that Sartain
disappeared after a beating witnessed by multiple parties; that Munn knew that
Sartain was diabetic and needed insulin; that Munn told Orona and Osborne to
give Sartain, who was in the garage, some food and water; and that a short time
later multiple witnesses reported a foul odor at Munn and Oronoa’s home—where
Sartain was last seen.  Additionally, a week after the beating, Munn stopped
receiving guests, he attempted to mask the odor with dryer sheets and Vick’s
Vapor Rub, and he cleaned the house.  Further, Johns saw Sartain’s severed head
and a tabletop full of knives and saws, Osborne saw a reddish stain on the
floor of Munn’s garage, and Munn described and demonstrated to Osborne how Munn
had dismembered Sartain’s body.  Finally, months after moving out of the house,
Munn told Brauer that he had cleaned up blood in the house and expressed
concern that police were conducting forensic testing in the home, and
acquaintances of Munn’s delivered a car similar to Sartain’s to a chop-shop in
an outlying county.  We conclude that the independent evidence corroborates
Munn’s extrajudicial confession.  Viewing the evidence in the light most
favorable to the jury’s verdict, we hold that a rational trier of fact could
have found beyond a reasonable doubt that Sartain is deceased and that Munn
intentionally and knowingly caused Sartain’s death by one, or a combination, of
the manners and means alleged in the indictment.  See Jackson, 443 U.S.
at 326, 99 S. Ct. at 2793; Clayton, 235 S.W.3d at 778; Cardenas v. State,
30 S.W.3d 384, 390 (Tex. Crim. App. 2000) (noting that all that is required in
corroborating an extrajudicial confession is that some evidence makes the
commission of the offense more probable than it would be without the evidence),
cert. denied, 130 S. Ct. 2094 (2010); see also Kitchens v.
State, 823 S.W.2d 256, 259 (Tex. Crim. App. 1991) (noting that when a jury
returning a guilty verdict on an indictment charging several alternate manners
and means, the verdict stands if the evidence is sufficient with respect to any
of the acts charged), cert. denied, 504 U.S. 958 (1992); Martinez v.
State, 723 S.W.2d 264, 265 (Tex. App.—San Antonio 1986, pet. ref’d)
(holding that evidence that victim died as a result of a severe beating
supported conviction for murder).  Accordingly, we hold that the evidence is
legally sufficient to support Munn’s conviction, and we overrule Munn’s first
point.

IV.  Motion for Mistrial

          In his third point, Munn argues
that the trial court erred by denying his motion for mistrial during voir dire. 
Specifically, he complains that “unacceptable jurors were seated on the jury
panel based upon receiving information in violation of Texas Code of Criminal
Procedure article 35.16(a)(10)[,]” which limited his “ability to properly and
specifically question all of the venire members.’’

A.  Standard of Review

          We review a trial court’s
ruling on a motion for mistrial for an abuse of discretion and must uphold the
trial court’s ruling if that ruling was within the zone of reasonable
disagreement. Wead v. State, 129 S.W.3d 126, 129 (Tex. Crim. App. 2004).
An abuse of discretion occurs “only when the trial judge's decision was so
clearly wrong as to lie outside that zone within which reasonable persons might
disagree.”  Cantu v. State, 842 S.W.2d 667, 682 (Tex. Crim. App. 1992), cert.
denied, 509 U.S. 926 (1993).  A mistrial is an extreme remedy for
prejudicial events occurring during the trial process and should be granted
only when residual prejudice remains after curative measures are sought and
denied in the trial court or “events are so emotionally inflammatory that
curative instructions are not likely to prevent the jury from being unfairly prejudiced
against the defendant.”  Young v. State, 137 S.W.3d 65, 71 (Tex. Crim.
App. 2004); see also West v. State, 121 S.W.3d 95, 106 (Tex. App.—Fort
Worth 2003, pet. ref’d) (noting mistrial appropriate only when prejudice exists
after objections have been sustained and curative instructions given).  A
motion for mistrial preserves error, but the court of criminal appeals has
stated that

when a party’s first action is to move for mistrial .
. . , the scope of appellate review is limited to the question [of] whether the
trial court erred in not taking the most serious action of ending the trial; in
other words, an event that could have been prevented by timely objection or
cured by instruction to the jury will not lead an appellate court to reverse a
judgment on appeal by the party who did not request these lesser remedies in
the trial court.

Young, 137 S.W.3d at 70.

B.  Applicable Law

Prospective jurors are not
challengeable for cause merely because they have heard news reports about the
crime or the suspect.  See Ladd v. State, 3 S.W.3d 547, 561 (Tex. Crim.
App. 1999), cert denied, 529 U.S. 1070 (2000).  A prospective juror is
subject to being excused if he has a bias or prejudice against the accused or
has formed a conclusion as to the guilt of the accused that would influence his
verdict.  Tex. Code Crim. Proc. Ann. art. 35.16(a)(9), (10) (West 2006).  Any
juror who can put aside any bias, prejudice, or conclusion of guilt and base
his verdict on the evidence presented in court may serve on the jury at the
trial court’s discretion.  Barber v. State, 737 S.W.2d 824, 829–30 (Tex.
Crim. App. 1987), cert. denied, 441 U.S. 967 (1979); see also Von
Byrd v. State, 569 S.W.2d 883, 890 (Tex. Crim. App. 1978), cert. denied,
441 U.S. 888 (1979).  Defense counsel has the burden to ask questions to elicit
information implicating a juror’s inability to be impartial, truthful, and the
like, and ask follow-up questions after uncovering potential bias.  Jones v.
State, 596 S.W.2d 134, 137 (Tex. Crim. App. 1980), overruled on other
grounds by Sneed v. State, 670 S.W.2d 262, 266 (Tex. Crim. App. 1984); Freeman
v. State, 168 S.W.3d 888, 891 (Tex. App.—Eastland 2005, pet. ref’d), cert.
denied, 547 U.S. 1208 (2006); see also Webb v. State, 232 S.W.3d
109, 113 (Tex. Crim. App. 2007) (“It is incumbent upon counsel to specifically
ask questions which will determine whether they have a right to challenge the
venire member.”); Armstrong v. State, 897 S.W.2d 361, 363–64 (Tex. Crim.
App. 1995) (recognizing that defense counsel has burden to ask questions to
determine a juror’s potential bias).  Even when a juror withholds information,
a conviction will only be reversed if the defendant exercises due diligence in attempting
to elicit that information. Jones, 596 S.W.2d at 137; see also Armstrong,
897 S.W.2d at 363–64.

C.  Voir Dire

During Munn’s portion of voir dire, a
panel member asked about the ramifications of remembering parts of the crime
from newspaper coverage.  Munn then asked the entire panel if “[a]nybody else .
. . thinks they know something about the case?”  The five jurors answering affirmatively
were identified as Victor Jones, Richard Hintermeier, Troy Rackliffe, James
McClure, and William Olcsvary.  After asking the entire panel this single
question about prior knowledge of the case, Munn moved onto a new topic and
made no further inquiries about media exposure during the remainder of his voir
dire.

D.  Individual Questioning 

At the conclusion of voir dire, the
trial court individually questioned nineteen panel members, including the five
identified above.

1.  Victor Jones

          Jones was the third venire person
questioned individually by the trial court.[7] 
Jones indicated that during the lunch break, he had looked the case up on the
internet and learned that “the gentlemen was homeless . . . [,] the [dispute]
was over a check[,] and . . . they cut up a car.”  In response to the trial
court’s question as to whether the information had led him to form an opinion
as to Munn’s guilt, Jones replied “I’d be more swayed to say yes more so than
not.”  Munn then asked the trial court to determine if Jones had spoken to
anyone else about the case:

          The Court:   Did anybody
else -- did you talk to anybody else about it?

[Jones]:       There was [sic] four of us.  They all
raised their hands.  We all got the names and numbers.

 

The Court:   They were reading it on Google?

 

[Jones]:       Yeah.

Prior to releasing Jones, the trial
court instructed him not to discuss the case with anyone else.  Citing article
35.16(a)(10), the trial court excused Jones from jury duty.

2.  Richard Hintermeier

          Hintermeier was the sixth venire
person individually questioned.[8]
 Hintermeier indicated that because the victim’s name sounded familiar, he
looked the case up on the internet over the break and confirmed what he had remembered:
that “there was a murder . . . , that a couple of people had been arrested . .
. . [, and] that there was an indictment and a conviction.”  The trial court
and both parties questioned Hintermeier about his ability to uphold the law and
whether he had formed an opinion about Munn’s guilt.  In concluding the
questioning of Hintermeier, the trial court asked if either party had any
additional questions and the following exchange occurred:

[Defense Counsel]:          Yes, Your Honor.  I’ve
only been asking people questions about the subject they’ve been brought in
for.  If there were other challenges for people, I haven’t -- in other words,
if there were -- 

 

          The Court:                      Oh,
no.  We can deal with those.

Hintermeier was not questioned
further after this exchange.  The trial court indicated that it “was not
satisfied in [its] discretion that [Hintermeier] could be impartial” and excused
Hintermeier under article 35.16(a)(10).

3.  Troy Rackliffe

          Rackliffe, the seventh venire member
individually questioned, went immediately after Hintermeier.  Rackliffe
indicated that he had “Googled” Munn’s name.  When asked if he could keep an
open mind as to punishment, Rackliffe said: “[I]f the facts that [I] read are
true and the jury says guilty, then I would go towards the higher end. . . . [i]n
my mind you have murder and then you have extreme cases, and what I read was more
extreme than just minor.”  Rackliffe indicated that he had read about Munn’s
“partner’s” conviction but that he did not recall the sentence imposed. 
Rackliffe admitted to discussing the case with Jones but stated that he had not
discussed the case with anyone else.  The court excused Rackliffe.

4.  William Olscvary

          Olscvary went tenth.[9]
 He indicated that he had overheard information about the case while walking
through the hallway outside the courtroom.  He was not sure if the people
discussing the case were venire members or if they were discussing something
they had heard and not something they knew.  He heard them speak about “the
type of injury, something about . . . . [k]eeping someone from getting medicine
and dying and some kicking and two people involved.”  He stated that he
continued to listen because he thought they might be discussing the case, that “no
names or anything were mentioned regarding who it was or when it happened[,]”
and that, after lunch based on statements made during Munn’s portion of voir
dire, he realized that the conversation in the hallway concerned Munn’s case.  The
trial court granted Munn’s challenge for cause of Olscvary.

5.  James McClure

          McClure was questioned immediately
after Olscvary.  McClure indicated that he did not read anything about the case
but that he had overheard a conversation between potential jurors in the
hallway about information on the case that one of them found on the internet. 
He stated that there were three or four people engaged in the conversation and
that he was about five feet away from them, “close enough that [he] couldn’t
not hear it.”  McClure noted that the entire panel was in the hallway at the
time he overheard the conversation, that the parties were not whispering, and
that he was unsure as to how many panelists were within “easy earshot” of the
conversation, giving an estimate of as few as four to as many as fifteen. 
McClure was also excused for cause.

6.  Remaining Venire Members

          After McClure’s questioning, Munn
moved for a mistrial, arguing that the entire panel had been tainted and stating,

I was under the impression from . . . Jones that the
only persons he discussed this with were [in] the lunch environment and that
they had all raised their hands and said they would come in and discuss the
issue with us.

 

Now two different panel members have indicated that
this was said in the open hallway out loud where anyone could hear.  At this point
I believe that the panel itself has been tainted, and I would make a motion for
a mistrial.

The trial court responded that it had
“always thought it was just right in the hallway with three or four other
people” and denied Munn’s motion for mistrial.  The trial court then granted
Munn a running objection and resumed individual voir dire.

After McClure, another eight
panelists were questioned.  Munn did not ask the first seven panelists if they had
any knowledge of, had been exposed to, or had overheard any information about
the case.  Michael Carter, the last panelist individually questioned, responded
“No[]” when Munn asked if Carter had “overhear[d] anything in the hallway,
people talking about facts that could be relative to th[e] case[.]”

Only one of the nineteen panelists
individually voir dired—Allen Elliot—was seated on the jury.[10] 
After the parties exercised their peremptory challenges, but before the jury
was empaneled, Munn reiterated his running objection to the panel arguing “that
the entire panel had been tainted by the conduct of five to six panel members
in the hallway.”[11] 
The trial court again overruled Munn’s objection.  The trial court empaneled,
but did not swear in, the jury; gave the jury members written instructions to
review overnight; instructed the jury not to “listen to or read anything about
th[e] case in the media . . . . [and to] not make any independent examinations
or investigations . . . . don’t Google, don’t do anything like that[;]” and
released the jury for the evening.

          The next morning, before
the jury was sworn in, Munn reiterated his objection to the panel and again
moved for a mistrial, arguing that he “should have been allowed to explore any
area of questioning which would have revealed a possible bias against [him] for
preconceived opinions.”  Munn argued that he was “not allowed” to question the
panel as to the existence or effect of a potential bias and, therefore,
“through no fault of [his own] . . . [he] was not able to effectively and intelligently
use [his] peremptory challenges on persons who may have a preconceived opinion.” 
In response, the State stressed that Munn had “effectively questioned the panel
after the incident” and that everyone who had indicated that he or she had any
knowledge had ultimately been excused.  The trial court denied Munn’s motion,
noting that

the [trial] [c]ourt is satisfied that based on the . .
. questioning of the jurors that there were I believe three to four around the
prospective juror . . . responsible for the internet transactions, all of those
came in and discussed their -- discussed what they saw.  And as [the State]
indicated, none of them made it on the jury.

The trial court again granted Munn a
running objection based on its denial of his motion for mistrial and, though no
request to quash the jury is in the record, the trial court also approved a
running objection based on its failure to quash the panel.  In its charges to
the jury at both the guilt and punishment stages, the trial court instructed
the jury that it was to consider only evidence presented at trial in reaching
its decisions.

E.  Analysis

          To support his contention that
unacceptable jurors were seated on the jury panel in violation of article
35.16(a)(10) and that the trial court should have granted a mistrial, Munn
relies on Franklin v. State, 138 S.W.3d 351 (Tex. Crim. App. 2004); Robinson
v. State, 851 S.W.2d 216 (Tex. Crim. App. 1991), cert. denied, 512
U.S. 1246 (1994); and Tijerina v. State, 202 S.W.3d 299 (Tex. App.—Fort
Worth 2006, pet. ref’d).

Munn’s reliance is misplaced.  In
both Franklin and Robinson, the alleged error was discovered or
occurred after the jury was empaneled and sworn in.  See Franklin, 138
S.W.3d at 352 (noting that alleged error was discovered when State called
complainant to testify); Robinson, 851 S.W.2d at 228–29 (recognizing
potential error when, after the close of evidence in the guilt/innocence phase
of the trial, juror indicated that her sister had told her about an article on
the case in the prior day’s newspaper).  In Tijerina, the error occurred
immediately after the trial court denied defense counsel’s request to reopen
voir dire to ask a previously disallowed question in a different form.  202
S.W.3d at 301.  Here, Munn discovered the potential bias during his portion of voir
dire, and the trial court neither prevented him from questioning the panel to
determine bias nor denied him the opportunity to reopen voir dire.

The record shows that Munn had the
opportunity to, and did, ask the entire panel about knowledge of the case; that
the five panelists who affirmatively answered were questioned individually and
stricken for cause; that Munn had the latitude to ask any of the nineteen
panelists questioned individually if they had overheard anything in the hallway
related to the case; that Munn did, in fact, exercise this option on a single
panelist and that the panelist answered in the negative; and that prior to
seeking a mistrial, Munn did not seek a lesser remedy such as requesting an
instruction or requesting to reopen voir dire to requestion the entire panel.  See
Gonzales v. State, 3 S.W.3d 915, 916–17 (Tex. Crim. App. 1999) (“We have
consistently held, with respect to oral questions asked during voir dire, that
error occurs where a prejudiced or biased juror is selected without fault or
lack of diligence on the part of defense counsel . . . .” (emphasis in
original, internal quotation omitted)); Armstrong, 897 S.W.3d at 363–64
(noting that defense counsel had obligation to ask follow-up questions after
uncovering potential bias).  Nothing in the record demonstrates that the trial
court failed to investigate any prospective juror admitting knowledge of the
case in violation of article 35.16(a)(10) or that any member of the seated jury
was biased by prohibited knowledge.  See Tex. Code Crim. Proc. Ann. art.
36.15(a)(10); Jones, 596 S.W.2d at 134 (affirming denial of mistrial due
to defense counsel’s failure to ask any questions calculated to bring out the
desired information); cf. Uranga v. State, 330 S.W.3d 301, 307 (Tex.
Crim. App. 2010) (rejecting implied-bias doctrine argument and holding that
standard of appellate review in denial of mistrial is “whether the trial court
abused its discretion on the factual issue of actual bias”).  Accordingly, we
cannot conclude that actual bias existed or that the events complained of were
so emotionally inflammatory that curative instructions would not have prevented
the jury from being unfairly prejudiced against Munn.  We cannot say that the
trial court erred by denying Munn’s motion for mistrial.  See Young, 137
S.W.3d at 65, 71 (holding that because an objection and related instruction
during voir dire would have cured harm resulting from improper questioning, the
trial court did not err by denying appellant’s motion for mistrial); see also
Gonzales, 3 S.W.3d at 917–18 (affirming jury selection when defense
counsel failed to ask questions to verify whether jurors failing to turn in
questionnaires had been involved in criminal cases); Jones, 596 S.W.2d
at 137 (finding no error when counsel failed to ask questions during
voir dire that would have uncovered juror’s previous employment at county jail
and that she had served as a witness in a criminal trial).  We overrule Munn’s
third point.

V.  Conclusion

          Having overruled all of Munn’s points, we affirm
the trial court’s judgment.

 

 

                                                                             BOB
MCCOY

                                                                             JUSTICE

 

PANEL:  LIVINGSTON, C.J.; DAUPHINOT
and MCCOY, JJ.

 

DO NOT PUBLISH

Tex. R. App. P. 47.2(b)

 

DELIVERED:  June 16, 2011









[1]See
Tex. R. App. P. 47.4.





[2]Munn
was also convicted of engaging in organized crime, but he does not appeal this
conviction.





[3]See
Orona v. State, No. 02-09-00182-CR, 2011 WL 679320 (Tex. App.—Fort Worth
Feb. 24, 2011, no pet h.).





[4]Matheny
was deceased at the time of Munn’s trial.





[5]The
record does not contain details about Sartain’s arrest.





[6]The
record does not indicate the details of this investigation.





[7]Munn
did not ask the first two of the nineteen venire persons questioned about their
knowledge of, or exposure to, media or news stories about the case.





[8]Munn
did not ask the two venire members questioned after Jones and before
Hintermeier about their knowledge of the case, discussions with other
panelists, or exposure to news stories about the case.





[9]Munn
did not ask the two venire members questioned between Rackliffe and Olscvary
about their knowledge of the case, discussions with other venire members, or
exposure to news stories about the case.





[10]After
the trial court and both parties questioned Elliot individually about his
ability to follow the law in assessing punishment, the trial court denied
Munn’s challenge for cause.





[11]The
State indicated that other than having “a couple of more strikes” it had no
objection to the composition of the jury.  Munn did not request additional
strikes.